# United States Court of Appeals

### *for the*

# Fifth Circuit

Case No. 25-10808

NESTOR BELTRAN,

*Plaintiff-Appellant,*

v.

LOCKHEED MARTIN CORPORATION,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH

## BRIEF FOR PLAINTIFF-APPELLANT

NICHOLAS W. WOODFIELD
EMPLOYMENT LAW GROUP, P.C.
1717 K Street, N.W., Suite 1110
Washington, DC 20006
(202) 261-2812

– and –

MICHAEL S. ALFRED
HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
(214) 953-0053

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Appellant certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1)   Plaintiff-Appellant:

Nestor Beltran

2)   Defendant-Appellee:

Lockheed Martin Corporation

3)   Counsel for Plaintiff-Appellant:

Nicholas Woodfield, R. Scott Oswald, The Employment Law Group, PC, Michael Alford, VerisLaw, PLLC

4)   Counsel for Defendant-Appellee:

Micah Prude, Sara Benson, Tony Campiti, Holland & Knight LLP

Respectfully submitted,

/s/ Nicholas Woodfield
Nicholas Woodfield, Esq.
The Employment Law Group, P.C.
1717 K St., N.W., Ste. 1110
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
*Counsel for Appellant*

i

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Nestor Beltran requests oral argument as he believes it could significantly aid the decisional process in this case.

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF AUTHORITIES .................................................................................v

STATEMENT OF JURISDICTION......................................................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE...............................................................................2

SUMMARY OF THE ARGUMENT ...................................................................14

ARGUMENT .......................................................................................................15

    I.    The district court erred when it made a factual determination that Beltran's January 6, 2023 email was not protected activity under the NDAA purportedly because, "nothing in Beltran's January 6, 2023 email establishes that Beltran reasonably believed he was making a disclosure regarding the gross mismanagement of a federal contract" such that his email amounted to no more than "run-of-the-mill policy disputes between managers and employees" .....................................15

        A.    Standard of Review .................................................................15

        B.    The district court erred when it decided upon the objective reasonableness of Beltran's belief when there was a genuine issue of material fact about what Beltran believed ...................................................................................16

        C.    The district court erred when it made a factual determination that Beltran unreasonably concluded that Lockheed's management's actions did not evidence gross mismanagement .................................................................23

D.      The district court erred when it determined that Beltran failed to state a viable NDAA claim by reporting a violation of a "law, rule, or regulation related to a Federal contract," "gross waste" of federal funds, or "substantial and specific danger to public health or safety by narrowly interpreting Beltran's email as raising issues of insignificant cost ............................................25

II.     The district court erred when it made a factual determination that Beltran failed to demonstrate a material fact exists regarding whether the email he sent to Lockheed top management on January 6, 2023, was the but-for causation of his termination .....................................................................................29

A.      Standard of Review..................................................................29

B.      Temporal Proximity .................................................................30

C.      Lockheed Martin's more lenient treatment of Beltran before he exercised his NDAA rights, compared to its harsh treatment of him afterwards, created a jury issue of causation ...............................................................................33

CONCLUSION .........................................................................................36

# TABLE OF AUTHORITIES

**Cases:**                                                         **Page(s)**

*Allen v. Admin. Rev. Bd.*,
514 F.3d 468 (5th Cir. 2008) ................................................... 17, 20, 21, 22

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006) ........................................................................................17

*Byers v. Dallas Morning News, Inc.*,
209 F.3d 419 (5th Cir. 2000) ........................................................................21

*Clark County School Dist. v. Breeden*,
532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ..............................31

*Craine v. Nat'l Sci. Found.*,
687 F. App'x 682 (10th Cir. 2017) ................................................................23

*Crane v. Lithia TO, Inc.*,
2014 WL 11600907 (W.D. Tex. Sept. 3, 2014), *aff'd*,
612 F. App'x 243 (5th Cir. 2015) ............................................................ 20, 21

*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*,
530 F.3d 395 (5th Cir. 2008) ........................................................................15

*Edwards v. First Tr. Portfolios L.P.*,
No. 3:23-CV-2239-BN, 2025 WL 256993
(N.D. Tex. Jan. 21, 2025) ................................................................ 17, 21, 22

*Fuerst v. Hous. Auth. of City of Atlanta, Georgia*,
38 F.4th 860 (11th Cir. 2022) ......................................................................24

*Lachance v. White*,
174 F.3d 1378 (Fed. Cir. 1999) ............................................................. 23-24

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*,
267 F.3d 1183 (11th Cir. 2001) ....................................................................22

*Long v. Eastfield Coll.*,
88 F.3d 300 (5th Cir. 1996) ..........................................................................22

*Lyons v. Katy Indep. Sch. Dist.*,
964 F.3d 298 (5th Cir. 2020) ........................................................................31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S.Ct. 1348 (1986) ...........................................................15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133, 120 S.Ct. 2097 (2000) ..................................................... 15, 30

*Shea v. Mgmt. and Training Corp.*,
580 F. Supp. 3d 389 (5th Cir. 2022)....................................................... 23, 25

*Turner v. Baylor Richardson Med. Ctr.*,
476 F.3d 337 (5th Cir. 2007) .........................................................................21

*United States ex rel. King v. Solvay Pharm., Inc.*,
871 F.3d 318 (5th Cir. 2017) ........................................................................16

*Washburn v. Harvey*,
504 F.3d 505 (5th Cir. 2007) ........................................................................31

*Wheat v. Fla. Par. Juv. Just. Comm'n*,
811 F.3d 702 (5th Cir. 2016) ................................................................. 34, 35

*White v. Dep't of Air Force*,
391 F.3d 1377 (Fed. Cir. 2004) ...................................................................24

*Wondercheck v. Maxim Healthcare Services, Inc.*,
495 F. Supp. 3d 472 (W.D. Tex. 2020) ..................................... 16, 23, 30, 34

*Wyatt v. Hunt Plywood Co., Inc.*,
297 F.3d 405 (5th Cir. 2002) ................................................................. 15, 29


**Statutes & Other Authorities:**

28 U.S.C. § 1291 .............................................................................................1

28 U.S.C. § 1331 .............................................................................................1

41 U.S.C. § 4712 .................................................................................. 1, 12, 25

41 U.S.C. § 4712(a) ......................................................................................26

41 U.S.C. § 4712(a)(1)...................................................................................16

41 U.S.C. § 4712(a)(2)(G)..............................................................................16

42 U.S.C. § 2000e ................................................................................... 1, 12

Fed. R. Civ. P. 56 .........................................................................................15

Fed. R. Civ. P. 56(c)................................................................................ 15, 29

*Webster's New World College Dictionary* (5th ed. 2014)........................24

## STATEMENT OF JURISDICTION

The United States District Court for the Northern District of Texas, Fort Worth Division had subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e *et seq*., and 41 U.S.C. § 4712 *et seq*. Appellant Nestor Beltran's claims arose under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") based on race and religion and the anti-retaliation provisions of the National Defense Authorization Act, 41 U.S.C. § 4712 *et seq*. ("NDAA"). This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to hear this appeal from the district court's grant of the Appellee Lockheed Martin Corp.'s motion for summary judgment on June 20, 2025, which Beltran appealed on July 2, 2025.

## STATEMENT OF THE ISSUES

I.       Whether the district court erred when it decided on summary judgment whether Beltran's raising safety/management concerns in an email he sent to Lockheed Martin's top management on January 6, 2023, was not protected activity under the NDAA purportedly because, "[i]n this case, nothing in Beltran's January 6, 2023 email establishes that Beltran reasonably believed he was making a disclosure regarding the gross mismanagement of a federal contract" such that his email amounted to no more than "run-of-the-mill policy disputes between managers and employees," even though this issue is a question of fact for the jury.

II.    Whether the district court erred when it granted Lockheed Martin's motion for summary judgment on Beltran's NDAA retaliation claim after determining that Beltran failed to demonstrate a material fact exists regarding whether the January 6, 2023 email he sent to Lockheed top management was the but-for causation of his termination.

## STATEMENT OF THE CASE

Beltran was an Inspector – Flight Operations for Lockheed Martin. ROA. 606-607. He inspected work performed by Lockheed Martin Mechanics and made determinations as to whether the work was performed correctly. ROA. 608-610. One of Beltran's supervisors was Mike Mahaffey. During the time at issue in this case, Mahaffey was the F-35 Quality Assurance Manager, and he was Beltran's supervisor. ROA. 746-747.

Lockheed had different inspector positions on the flight line where Beltran works: Inspector – Flight Operations and Inspector – Electronics. In December 2022, Mahaffey gave Beltran an order to log a task when the work was ready for inspection. ROA. 517-518. Beltran said he would not do the work unless Mahaffey gave him an AVO, an "Avoid Verbal Order." ROA. 518-519. Beltran did not refuse the task Mahaffey was instructing him to complete. Mahaffey had previously instructed Beltran not to put any notes in the maintenance action of the work orders. ROA. 955-956. This impacted Beltran's ability to issue himself an AVO because he

would normally add an AVO in the maintenance notes. Because Beltran was no longer allowed to do that according to Mahaffey's directive, he requested an AVO from Mahaffey in order to perform the task:

> 181:20      A. Well, typically, what I would do in the past, if
> 21      -- if I had any conflict with management, like an AVO, and
> 22      they don't want to give it to me, I can go into the notes
> 23      section and I would write per quality management this has
> 24      been authorized, right. And then I would be comfortable
> 25      signing that.
> 182:1 So when Mr. Mahaffey told me that I could no
> 2      longer put notes into the maintenance actions and put them
> 3      outside of those maintenance actions really my only option
> 4      was an AVO which he refused to provide. So without the
> 5      ability and violating his directive to not write in the
> 6      maintenance actions and then not get an AVO for obvious
> 7      issues, then the liability is all on me, and I was not
> 8      okay with that. That's why I did not refuse the work. I
> 9      asked for the avoid verbal orders in any form.

ROA. 957:20-958:9. Mahaffey refused to issue Beltran an AVO and said that Beltran would be removed if he did not agree to complete the task. *Id.* Beltran did not complete the task, since he did not receive an AVO, and he was removed from the building. *Id*. Lockheed issued Beltran an indefinite suspension as a result in December of 2022. ROA. 710.

Lockheed management asked Irvin Hodges to complete the same task Beltran was asked to complete. ROA. 666-667. Hodges and Beltran held the same position. ROA. 526. Hodges wrote an email to his manager Aaron Belz asking him for an AVO to complete the work because the task was listed as an avionics skill function,

and Hodges would need an AVO to proceed if they are going to deviate from the classification. ROA. 666-667. Belz responded in writing that Hodges should perform the work. *Id.* Hodges accepted Belz's written order as an AVO. *Id.*

Elizabeth Jelich is a Lockheed management employee responsible to "investigate, discover, or address misconduct." Jelich was Lockheed's senior-most manager for Quality on the F-35 contract. She was Lockheed's Quality director of its F-35 contract from approximately 2022 until August 2024, ROA. 1020:9-19, 1021:20-25, and was a senior Lockheed management employee. ROA. 1020:20-1021:19 (". . . [f]rom there just progressive responsibility. Moved over to F-35 Supplier Quality where I was a senior manager"). As the director for Quality, Jelich was responsible for "the Quality management system execution of all F-35 production. . . [t]he Quality function leadership. . . Quality Control, Quality Assurance, Quality Engineering teams." ROA. 1022:1-9. Not only was Jelich responsible for managing Quality, she managed other Quality leadership and was the highest management employee in Quality for the F-35 contract. Jelich forwarded Beltran's January 6, 2023 email to Xavier Jefferson, Lockheed's resident head of Labor & Employee Relations, to review Beltran's reported concerns. Beltran's January 6, 2023 email is a protected disclosure under the NDAA. Beltran raised multiple concerns in his January 6, 2023 email to Jelich:

I want to share my concerns that are affecting the performance of the Quality Inspectors. My intent is to provide you with a different perspective than what's possibly being provided to you by Flight Line Quality Leadership. The two topics below are the most recent examples of recurring issues affecting our Flight Line Quality Inspectors.

1. Quality Leadership is undermining Inspectors on documented non-conformances, specifically, Troubleshooting (T/S) Maintenance Actions (M/A). A fluid leak on BF-148, DOMMS maintenance action DOMM22338S000000002 was initiated for corrective action. Quality canceled/skipped the T/S disposition which outlined all requirements. They also removed the picture attachment in the M/A of the fluid leak and replaced the attachment with a blurred, less revealing one. Furthermore, they did not follow our T/S or Break of Inspection process and completed the M/A without investigating the leak source or allowable limits. The leak was located under a panel that requires DCMA buy-back. I was notified by a fellow Inspector who witnessed Quality Manager, John Reid, provide direction in the execution of the non-conformance on the aircraft. Please refer to the attached attachment for the M/A details.

2. Avoid Verbal Orders (AVO) -Union Leadership informed me, "Labor Relations has decided that AVO's will no longer be issued to Quality." I asked Quality Associate Manager, Michael D. Mahaffey, what's the policy on AVOs? His response was, "Per John Reid and Labor Relations, AVOs will no longer be provided." This new company policy will create problems for Inspectors as we are responsible for validating Production's procedure and policy compliance. As Inspectors, our signatures indicate process and procedure compliance, and that work has been performed per planning. AVOs are documentation proving Lockheed Martin Leadership has authorized a policy or procedure variance. Without AVOs, inspectors are placed in an uncomfortable and quite possibly an unethical situation because there is no written

proof of a directive that authorizes a variance to policies and procedure has been given. This leads to the case where Leadership will have the final authority and direct how and when an Inspector's signature is used. Removing AVOs will only serve to degrade trust and confidence in Leadership, because Quality Inspectors will be held liable if we do or do not follow leadership's direction to vary policies and procedures.

On a personal level, I have consistently experienced the above issues throughout my employment at LM Aeronautics Flight Line. I have been taken to Labor Relations and reassigned work locations numerous times throughout the past six years over similar concerns as above. Attempts have been made by Leadership to impede and sometimes prevent me from properly performing my Inspector duties and frequently I have been forced to defend myself formally in the execution of my assigned duties which are mandated in the Quality Inspector job description, and in the company's policies, procedures, and planning requirements. Inspectors should not have to argue a rejection or work stoppage because of **work signed for, but not performed by Production,** poor execution of planning, dismissing planning, or disregarding engineering data. These requirements are contractually mandated and paid for by our customer.

I have thought long and hard about my treatment and experiences at Lockheed Martin Aeronautics. I have witnessed countless incidents committed by other employees that called for disciplinary action, write-ups, or verbal counseling; yet these employees begin and complete their workday without any concern or fear of repercussion. My time away from work is consumed by the thoughts of these experiences.

Most recently, I was denied an AVO on an aircraft inspection, whereas soon after, another Inspector received an AVO for the same task on the same aircraft that I had been denied the AVO. Furthermore, the same concerns were shared by production personnel who initiated an ESH Close Call for Leadership disregarding JTD safety warnings and requirements. No one else

but I, experienced any disciplinary action or consequences. It is clear to me that I'm being **targeted, harassed, and discriminated against.** Many of the decisions directed towards me from leadership appear to have subtle traits of prejudice and in some cases outright hatred. For example, I recently applied for a Quality Supervisor position (617994BR) my application did not even make it through the review process. I could not even get an opportunity for an interview. One might assume that my 24-year aviation career with the US Navy, much of it focused on Quality Assurance, as well as my six years at LM as a Quality Inspector would at least warrant an opportunity to interview.

I believe the poor treatment I have received from Quality Leadership and Labor Relations is personal with the most recent example and of which you are aware, was my being placed on indefinite suspension over an **"AVO"** on 13 Dec 2022 with Union Leadership bringing me back to work on 21 Dec 2022. Due to this unwarranted suspension, I lost 40+ hours of pay plus the potential for overtime work. Mr. Mahaffey's decision to circumvent avionics inspection requirements and his subsequent refusal to provide me an AVO coupled with his decision to have me walked out caused me great humiliation in front of my peers. Because of Mr. Mahaffey's actions, my family and I were directly affected due to the fear of the possible loss of my employment and the resulting financial hardship. In closing I want to say that during my employment with LM I have been forced to endure this psychological stress, its impact upon my family, especially during the holidays is **inexcusable.**

Respectfully,

Nestor Beltran

ROA. 1011-1012, bolding in original, underlining added.

Jelich forwarded Beltran's January 6, 2023 email to Jefferson on January 12, 2023. ROA. 1011-1012. Jefferson read Beltran's email and noted that it raised, "things that should be raised to Ethics' attention and that they should investigate":

27:22 Q.    Do you recall this email that was sent
23     on January 6, 2023 by Nestor Beltran to Elizabeth
24     Jelich, Paul Black, Susan Lane, Aaron Dumas and
25     JoAnn O'Brien that was subsequently sent to you
28:1    on January 12, 2023 by Ms. Jelich?
2      A.    I do recall receiving this email.

ROA. 993:22-25, 995:1-2.

30:4 Q.    Did you read Mr. Beltran's email?
5      A.    At the time.
6      Q.    You did?
7      A.    Yes.
8      Q.    And were there any statements or
9      allegations in it that caused you any concern?
10     A.    Not beyond those things that should be
11     raised to Ethics' attention and that they should
12     investigate.
13     Q.    And did you form the opinion at the
14     time you saw this or any point thereafter that
15     Mr. Beltran had raised these concerns for any
16     improper purpose?
17     A.    Nothing on the face of the email would
18     have given me that impression.
19     Q.    Did you ever form the opinion that
20     Mr. Beltran raised these concerns other than in
21     good faith?
22     A.    Again, nothing on the face of the
23     emails would have given me that impression.
24     Q.    And outside of that, did you ever form
25     the opinion that he had raised it for some
31:1    improper purpose or other than in good faith?
2      A.    No.

ROA. 994:4-25, 996:1-2.

On March 22, 2023, Beltran rejected a task three times, stating that it "required

skill category Avionics," and required "wire repair [on] fiber optics per MTE notes."

8

ROA. 851-855. Beltran did not inspect the plane before rejecting the task. ROA. 794-795. The wire repair did not involve Fiber optics. ROA. 764-765. Mahaffey spoke with Beltran and asked Beltran to walk over to the plane to inspect the issue. ROA. 766-768. Beltran did not go to the aircraft with Mahaffey. ROA. 768. Mahaffey gave Beltran a direct order to perform the task and read a statement provided to him by Labor Relations. ROA. 772-773. Mahaffey had Beltran removed from the facility by security. ROA. 774. Beltran stated that he would not do the task unless he received an AVO. ROA. 557-559.

Jefferson testified at deposition that he was the chairperson of Lockheed's Discipline Review Committee (DRC), ROA. 987:13-14, and that he was the sole decision-maker regarding Beltran's termination: "I am the ultimate decision-maker, yes." ROA. 1007:12-14. In fact, Jefferson was nearly unilaterally responsible for (1) the decision to take the case to the DRC, ROA. 987:8-12, ("Q: Who makes the determination that a DRC should be convened? A: The DRC is convened based on cases that are submitted and reviewed by myself as the DRC chair."); (2) building the file against Beltran, ROA. 1004:15-1006:3; and (3) making the final decision regarding Beltran's discipline. ROA. 1007:12. Jefferson was uniquely positioned to place his thumb on the scale to steer the DRC to a particular outcome—in this case terminating Beltran—and then institute that outcome. Importantly, Jefferson was also responsible for ensuring that the DRC documents were "complete" and that

there were no "gaps" in the information, ROA. 1004:15-1005:1, and he supervised

the labor employees who presented the file to the DRC. ROI.1006:4-10, 1029:19-

21, 1030:5-9.

Jefferson also testified that Lockheed has no objective standards that govern

when he should convene a DRC to address the issue of whether an employee should

be terminated. Rather, Jefferson subjectively made the decision to refer Beltran to a

DRC based solely on Jefferson's belief that he could present evidence to the DRC

that would probably meet the CBA's just-cause standard if the removal was later

grieved:

> 25:14    Q.   And were there any objective criteria?
> 15    Were you looking at guideposts or guidelines
> 16    given to you by Lockheed where in your opinion it
> 17    just didn't warrant --
> 18    A.   Not guideposts issued by Lockheed
> 19    Martin.  But again, our Collective Bargaining
> 20    Agreement dictates that with respect to
> 21    termination decisions or disciplinary decisions I
> 22    must apply just cause, right.  And so based on my
> 23    review of the facts that were presented, I didn't
> 24    feel like I could meet that standard to take that
> 25    case to DRC.  And so that's why the
> 26:1    recommendation was issued to look at something
> 2    less than -- less than termination.
> 3        Q.   But if you had felt a little more
> 4    confident before you might have raised it for a
> 5    DRC?
> 6        A.   Yes.
> 7        Q.   So it's really how you feel about the
> 8    case as to whether it gets a DRC or not, correct?
> 9    A.   It depends on what you mean by how I
> 10    feel.  I don't know that my feelings have much to

11   do with it versus looking at objective facts and
12   trying to figure out if they align with the
13   just-cause standard or not.
14        Q.    What is the just-cause standard?
15        A.    So the just-cause standard, typically
16   when we take cases to a third party, an
17   arbitrator, we need to meet certain standards
18   that show that an employee was afforded due
19   process, that the outcome was equitable, that the
20   facts on its face actually proved the violation,
21   that the rule in place was reasonable.  It's a
22   series of tests that I go through in reviewing
23   cases at DRC, and consistent with our Collective
24   Bargaining Agreement, as well as standards that
25   are set in the labor space, to determine if just
27:1  cause is met.  And that's the standard that I
2   look at whenever I review any case from
3   disciplinary standpoint, especially when it comes
4   to making termination decisions for an employee.

ROA. 991:14-993:4.

41:18     Q.    And so would Mr. Beltran have been put
19         forward for a DRC in December of 2022 but for
20         Mr. Hodges getting that AVO, or as he interpreted
21         that document to be an AVO?
22         A.    But for that information being brought
23         forward, that really was the (unintelligible).  I
24         guess, yes.
25         Q.    And so instead of being terminated on
42:1       that date, what did you decide might be the
2         appropriate discipline?
3         A.    I recommended that we issue a
4         five-day -- go ahead and return him from the
5         indefinite suspension, and I recommended that we
6         treat it as a five-day DLO, which is essentially
7         a last and final warning.
8         Q.    In terms of making that decision, it
9         was based on your judgment as to whether you
10        could meet the just-cause termination standard --

| | |
|---|---|
| 11 | or the just-cause standard in a subsequent |
| 12 | arbitration if it was challenged, correct? |
| 13 | A.   It was -- it was -- yes.  In reviewing |
| 14 | the facts I felt it was enough to muddy the |
| 15 | question.  And any time we can control the |
| 16 | outcome or ask a third party, we try to do that. |

ROA. 999:18-1000:16.

Lockheed Martin placed Beltran on an indefinite suspension after removing him from the facility on March 22, 2023, and Jefferson, Lockheed's Senior Manager of Labor and Employee Relations for Lockheed Martin's Fort Worth Facility, and his team investigated and evaluated the facts to determine the appropriate level of discipline. ROA. 686-688, 698, 710, 766. Jefferson made the decision and implemented the process to terminate Beltran's employment in March of 2023 when he referred Beltran's case to the DRC because Jefferson personally believed there was evidence to support a just cause standard for Beltran's termination. ROA. 987:8-14, 1004:15-1006:3, 1007:12-14.

Beltran filed suit on February 2, 2024, in the United States District Court for the District of Maryland. ROA. 2. On July 18, 2024, the case was transferred to this Northern District of Texas, Fort Worth Division. ROA. 6. On August 7, 2024, Beltran filed an Amended Complaint alleging three causes of action against Lockheed Martin: (1) Retaliation under Section 828 of the 2013 National Defense Authorization Act, 41 U.S.C. § 4712 *et seq.* ("NDAA"); (2) Discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*

("Title VII"); and (3) Retaliation under Title VII. ROA. 7.

Lockheed Martin filed a motion for summary judgment on all claims asserted by Beltran on May 2, 2025, and on May 23, 2025, Beltran filed his opposition brief. ROA. 10, 458, 875. Lockheed Martin file its reply brief on June 6, 2025, and the district court granted Lockheed Martin's motion for summary judgment on all counts on June 20, 2025. ROA. 10, 1093, 1107.

## SUMMARY OF THE ARGUMENT

The district court erred when it did not view all facts and reasonable inferences drawn from such facts in the light most favorable to Beltran as the nonmoving party and when it decided on summary judgment whether Beltran's raising safety/management concerns in an email he sent to Lockheed Martin's top management on January 6, 2023, was not protected activity under the NDAA purportedly because, "nothing in Beltran's January 6, 2023 email establishes that Beltran reasonably believed he was making a disclosure regarding the gross mismanagement of a federal contract" such that his email amounted to no more than "run-of-the-mill policy disputes between managers and employees," even though this issue is a question of fact for the jury.

The district court erred when it did not view all facts and reasonable inferences drawn from such facts in the light most favorable to Beltran as the nonmoving party and when it granted Lockheed Martin's motion for summary judgment on Beltran's NDAA retaliation claim after determining that Beltran failed to demonstrate a material fact exists regarding whether the email he sent to Lockheed top management on January 6, 2023, was the but-for causation of his termination.

# ARGUMENT

**I.     The district court erred when it made a factual determination that Beltran's January 6, 2023 email was not protected activity under the NDAA purportedly because, "nothing in Beltran's January 6, 2023 email establishes that Beltran reasonably believed he was making a disclosure regarding the gross mismanagement of a federal contract" such that his email amounted to no more than "run-of-the-mill policy disputes between managers and employees."**

## A.     Standard of Review.

This Court reviews *de novo* a district court's ruling on a motion for summary judgment, applying the same legal standard as the district court in the first instance. *Wyatt v. Hunt Plywood Co., Inc.,* 297 F.3d 405, 408 (5th Cir. 2002). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Wyatt,* 297 F.3d at 408–09.

Weighing evidence is inappropriate at the summary-judgment stage. Fed. R. Civ. P. 56. When assessing whether a dispute to any material fact exists while ruling on a summary-judgment motion, a court shall consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097 (2000); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348 (1986); *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

**B. The district court erred when it decided upon the objective reasonableness of Beltran's belief when there was a genuine issue of material fact about what Beltran believed.**

To establish a *prima facie* case of retaliation under the NDAA, a plaintiff "must first establish a prima facie case of retaliation by showing: (1) [they] engaged in protected activity; (2) the employer knew about the protected activity; and (3) the employer retaliated against the employee because of [their] protected activity." *Wondercheck v. Maxim Healthcare Services, Inc.*, 495 F. Supp. 3d 472, 480 (W.D. Tex. 2020) (citing *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 332 (5th Cir. 2017)). The NDAA only protects "[a]n employee of a contractor, subcontractor, grantee, subgrantee, or personal services contractor" from "discharge[], demot[ion], or other[] discriminat[ion. . .] as a reprisal for disclosing . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific public danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract. . . or grant." 41 U.S.C. § 4712(a)(1). The employee only accrues protection if they make their disclosures to, among others, "[a] management official or other employee of the contractor. . . who has the responsibility to investigate, discovery, or address misconduct." 41 U.S.C. § 4712(a)(2)(G).

The district court held that Beltran's raising safety/management concerns in the email he sent to Lockheed Martin's top management on January 6, 2023, was not protected activity under the NDAA purportedly because, "[i]n this case, nothing in Beltran's January 6, 2023 email establishes that Beltran reasonably believed he was making a disclosure regarding the gross mismanagement of a federal contract" such that his email that amounted to no more than "run-of-the-mill policy disputes between managers and employees."

The Fifth Circuit scrutinizes an employee's reasonable belief under "both a subjective and objective standard." *Allen v. Admin. Rev. Bd.,* 514 F.3d 468, 477 (5th Cir. 2008); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ("An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."). *Edwards v. First Tr. Portfolios L.P.*, No. 3:23-CV-2239-BN, 2025 WL 256993, at *5 (N.D. Tex. Jan. 21, 2025). The factual question of whether Beltran was attempting to soften the language of an email to make it less accusatory out of fear of retaliation does not equate to a basis that he was *not* engaging in protected conduct. *See Edwards v. First Tr. Portfolios L.P.*, No. 3:23-CV-2239-BN, 2025 WL 256993, at *6 (N.D. Tex. Jan. 21, 2025).

Beltran raised multiple concerns in his January 6, 2023 email to Jelich:

I want to share my concerns that are affecting the performance of the Quality Inspectors. My intent is to provide you with a different perspective than what's possibly being provided to you by Flight Line Quality Leadership. The two topics below are the most recent examples of recurring issues affecting our Flight Line Quality Inspectors.

1. Quality Leadership is undermining Inspectors on documented non-conformances, specifically, Troubleshooting (T/S) Maintenance Actions (M/A). A fluid leak on BF-148, DOMMS maintenance action DOMM22338S000000002 was initiated for corrective action. Quality canceled/skipped the T/S disposition which outlined all requirements. They also removed the picture attachment in the M/A of the fluid leak and replaced the attachment with a blurred, less revealing one. Furthermore, they did not follow our T/S or Break of Inspection process and completed the M/A without investigating the leak source or allowable limits. The leak was located under a panel that requires DCMA buy-back. I was notified by a fellow Inspector who witnessed Quality Manager, John Reid, provide direction in the execution of the non-conformance on the aircraft. Please refer to the attached attachment for the M/A details.

2. Avoid Verbal Orders (AVO) -Union Leadership informed me, "Labor Relations has decided that AVO's will no longer be issued to Quality." I asked Quality Associate Manager, Michael D. Mahaffey, what's the policy on AVOs? His response was, "Per John Reid and Labor Relations, AVOs will no longer be provided." This new company policy will create problems for Inspectors as we are responsible for validating Production's procedure and policy compliance. As Inspectors, our signatures indicate process and procedure compliance, and that work has been performed per planning. AVOs are documentation proving Lockheed Martin Leadership has authorized a policy or procedure variance. Without AVOs, inspectors are placed in an uncomfortable and quite possibly an unethical situation because there is no written

proof of a directive that authorizes a variance to policies and procedure has been given. This leads to the case where Leadership will have the final authority and direct how and when an Inspector's signature is used. Removing AVOs will only serve to degrade trust and confidence in Leadership, because Quality Inspectors will be held liable if we do or do not follow leadership's direction to vary policies and procedures.

On a personal level, I have consistently experienced the above issues throughout my employment at LM Aeronautics Flight Line. I have been taken to Labor Relations and reassigned work locations numerous times throughout the past six years over similar concerns as above. Attempts have been made by Leadership to impede and sometimes prevent me from properly performing my Inspector duties and frequently I have been forced to defend myself formally in the execution of my assigned duties which are mandated in the Quality Inspector job description, and in the company's policies, procedures, and planning requirements. Inspectors should not have to argue a rejection or work stoppage because of **work signed for, but not performed by Production,** poor execution of planning, dismissing planning, or disregarding engineering data. These requirements are contractually mandated and paid for by our customer.

I have thought long and hard about my treatment and experiences at Lockheed Martin Aeronautics. I have witnessed countless incidents committed by other employees that called for disciplinary action, write-ups, or verbal counseling; yet these employees begin and complete their workday without any concern or fear of repercussion. My time away from work is consumed by the thoughts of these experiences.

Most recently, I was denied an AVO on an aircraft inspection, whereas soon after, another Inspector received an AVO for the same task on the same aircraft that I had been denied the AVO. Furthermore, the same concerns were shared by production personnel who initiated an ESH Close Call for Leadership disregarding JTD safety warnings and requirements. No one else

> but I, experienced any disciplinary action or consequences. It is
> clear to me that I'm being **targeted, harassed, and**
> **discriminated against.** Many of the decisions directed towards
> me from leadership appear to have subtle traits of prejudice and
> in some cases outright hatred.

ROA. 1011-1012, bolding in original, underlining added.

Jelich forwarded Beltran's January 6, 2023 email to Jefferson on January 12,

2023. *Id*. Jefferson read Beltran's email and noted that it raised, "things that should

be raised to Ethics' attention and that they should investigate":

> 27:22 Q.  Do you recall this email that was sent
> 23      on January 6, 2023 by Nestor Beltran to Elizabeth
> 24      Jelich, Paul Black, Susan Lane, Aaron Dumas and
> 25      JoAnn O'Brien that was subsequently sent to you
> 28:1   on January 12, 2023 by Ms. Jelich?
> 2       A.  I do recall receiving this email.

ROA. 993:22-25, 995:1-2.

This court noted in *Crane v. Lithia TO, Inc.* that:

> The Fifth Circuit has equated the "objective reasonableness"
> standard to be used in Sarbanes-Oxley cases with the standard
> used in the Title VII retaliation context. *Id.* The objective
> reasonableness of an employee's belief therefore cannot be
> decided as a matter of law if there is a genuine issue of material
> fact, meaning that "reasonable minds could disagree on [the]
> issue." *Id.* at 477-78 (citation omitted).

2014 WL 11600907, at *4 (W.D. Tex. Sept. 3, 2014), *aff'd*, 612 F. App'x 243 (5th

Cir. 2015).

> A court scrutinizes an employee's "reasonable belief" that a
> violation occurred under both an objective and subjective
> standard. *Allen*, 514 F.3d at 477. The objective reasonableness of

> a plaintiff's belief is evaluated based on the knowledge available
> to a reasonable person in the same factual circumstances, with
> the same training and experience as the aggrieved employee. *Id.*
> (citations omitted).

*Crane*, 2014 WL 11600907, at *4.

Beltran testified that he believed he was reporting wrongdoing to Jelich. ROA. 864-870. In *Edwards v. First Trust Portfolios L.P.*, the court held that the objective reasonableness of an employee's belief cannot be decided as a matter of law if there is a genuine issue of material fact:

> And, so long as Edwards's belief that that First Trust's Year-End Gift
> Policy potentially violated an SEC rule or regulation was reasonable,
> he satisfies his burden – even if it later turned out to be erroneous. *See
> Allen*, 514 F.3d at 477 ("[A]n employee's reasonable but mistaken
> belief that an employer engaged in conduct that constitutes a violation
> of one of the six enumerated categories is protected.").

> The Court turns to whether Edwards's belief was objectively
> reasonable.

> "The objective reasonableness of a belief is evaluated based on the
> knowledge available to a reasonable person in the same factual
> circumstances with the same training and experience as the aggrieved
> employee." *Id.*

> The "objective reasonableness" standard applicable to SOX
> whistleblower claims is similar to the "objective reasonableness"
> standard applicable to Title VII retaliation claims. *Id.* (citing *Turner v.
> Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007)). "In
> Title VII retaliation cases, the objective reasonableness of an
> employee's belief can be decided as a matter of law in some cases." *Id.*
> (citing *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427-28 (5th
> Cir. 2000)).

But "the objective reasonableness of an employee's belief cannot be decided as a matter of law if there is a genuine issue of material fact." *Id.* (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 305 (5th Cir. 1996)). "If '[r]easonable minds could disagree on this issue,' the objective reasonableness of an employee's belief should not be decided as a matter of law, and the fact-finder's resolution of the issue is entitled to deference on appeal." *Id.* at 477-478 (citing *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1188 (11th Cir. 2001)).

*Edwards*, 2025 WL 256993, at *7 (N.D. Tex. Jan. 21, 2025).

Jelich was Lockheed's senior-most manager for Quality on the F-35 contract. She was the Lockheed's Quality director of its F-35 contract from approximately 2022 until August 2024, ROA. 1020:9-19, 1021:20-25, and was a senior Lockheed management employee. ROA. 1020:20-1021:19 (". . . [f]rom there just progressive responsibility. Moved over to F-35 Supplier Quality where I was a senior manager"). As the director for Quality, Jelich was responsible for "the Quality management system execution of all F-35 production. . . [t]he Quality function leadership. . . Quality Control, Quality Assurance, Quality Engineering teams." ROA. 1022:1-9. Not only was Jelich responsible for managing Quality, she also managed other Quality leadership—she was the highest management employee in Quality for the F-35 contract. Jelich forwarded Beltran's January 6, 2023 email to Jefferson, Lockheed's resident head of Labor & Employee Relations, to review Beltran's reported concerns. ROA. 1011-1012.

Beltran raised in the forgoing email specific and unambiguous concerns supported by specific examples that that Lockheed's quality leadership was

undermining inspectors, canceling corrective actions identified as necessary by those inspectors, and altering inspection records, including reporting that, "Inspectors should not have to argue a rejection or work stoppage because of work signed for, but not performed by Production, poor execution of planning, dismissing planning, or disregarding engineering data. These requirements are contractually mandated and paid for by our customer." ROA. 1012. As such Beltran reported a violation of a "law, rule, or regulation related to a Federal contract," "gross waste" of federal funds, or "substantial and specific danger to public health or safety." *Shea v. Mgmt. and Training Corp.*, 580 F. Supp. 3d 389, 392 (5th Cir. 2022) (citing *Craine v. Nat'l Sci. Found.*, 687 F. App'x 682, 691 (10th Cir. 2017)). There is no requirement in the statute that Beltran affirmatively assert that he is making a protected disclosure under the NDAA. *See Wondercheck*, 495 F. Supp. 3d at 480; *Shea*, 580 F. Supp. 3d at 392.

### C. The district court erred when it made a factual determination that Beltran unreasonably concluded that Lockheed's management's actions did not evidence gross mismanagement.

The Federal Circuit has held that the proper test of finding gross mismanagement is whether "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably [could] conclude that the actions of the government evidence gross mismanagement?" "A purely subjective perspective of an employee is not sufficient even if shared by other employees." *Lachance v. White*, 174 F.3d 1378, 1381 (Fed.

Cir. 1999). "If the disclosure of that information indicated that error in adoption or continuation of the policy is not debatable, the disclosure is protected, regardless of whether the agency can marshal other information supporting the policy that the employee could not have reasonably obtained at the time of disclosure." *White v. Dep't of Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004). The Fourth Circuit defines "gross" as "glaring; flagrant; very bad," and "mismanage" as "to manage or administer badly or dishonestly." *Fuerst v. Hous. Auth. of City of Atlanta, Georgia*, 38 F.4th 860, 873 (11th Cir. 2022) (citing *Webster's New World College Dictionary*, 640, 935 (5th ed. 2014)).

Beltran identified a leak in a F-35 jet aircraft in December of 2022, and subsequently that aircraft later crashed on Lockheed property during its test flight, forcing the test pilot to eject from the aircraft. ROA. 19, 437. That aircraft identified as an "F-35. BF-148". ROA. 864, 1011-1012. The cost of a single F-35 jet aircraft is well into the range of gross mismanagement. Therefore, anyone with knowledge of the cost of an aircraft and the correlation between maintenance work being conducted and the opportunity for a *single* maintenance error causing catastrophic damage to an aircraft or similarly an error causing the aircraft to crash, (as it in did in 2022), "reasonably [could] conclude that the actions of the government evidence gross mismanagement." ROA. 19, *White*, 174 F.3d 1381 . Any oversight by

Lockheed, giving rise to the possibility of being non-compliant with Federal Regulations, could certainly be found to be gross mismanagement.

In the district court's Order it states, "there is no evidence this cost to the customer is significant in light of the overall contract." ROA. 1106. Alternatively, there is no evidence this cost to the customer is *unsignificant*, and this is precisely the determination that was suited for a fact finder. Whether tens of thousands of dollars might not rise to the gross mismanagement of a $10.1 million contract ignores the contingent cost of the gross mismanagement, which is potentially the cost of F-35 aircraft, the lives of its pilots, and the sequalae of a crash on the ground.

> **D. The district court erred when it determined that Beltran failed to state a viable NDAA claim by reporting a violation of a "law, rule, or regulation related to a Federal contract," "gross waste" of federal funds, or "substantial and specific danger to public health or safety by narrowly interpreting Beltran's email as raising issues of insignificant cost.**

Beltran made a claim of retaliation under 41 U.S.C. § 4712 *et seq*., and the district court granted summary judgment after reaching the factual determination that "there is no evidence this cost to the customers is significant especially in light of the overall contract. *See Shea v. Mgmt. & Training Corp*., 580 F. Supp. 3d 389, 392 (W.D. Tex. 2022) (holding that a '$3,239.25 to $13,430.00' mismanagement did not arise to the gross mismanagement of a $10.1 million contract)."

41 U.S.C. § 4712(a) mandates that:

> An employee of a contractor, subcontractor, grantee, subgrantee, or
> personal services contractor may not be discharged, demoted, or
> otherwise discriminated against as a reprisal for disclosing to a
> person or body described in paragraph (2) information that the
> employee reasonably believes is evidence of gross mismanagement
> of a Federal contract or grant, a gross waste of Federal funds, an
> abuse of authority relating to a Federal contract or grant, a
> substantial and specific danger to public health or safety, or a
> violation of law, rule, or regulation related to a Federal contract
> (including the competition for or negotiation of a contract) or grant.

Beltran raised concerns about gross mismanagement of a Federal contract, a
gross waste of Federal funds, an abuse of authority relating to a Federal contract,
and a substantial and specific danger to public health or safety in his January 6, 2023
email to Jelich when he reported that:

> I want to share my concerns that are affecting the performance
> of the Quality Inspectors. My intent is to provide you with a
> different perspective than what's possibly being provided to you
> by Flight Line Quality Leadership. The two topics below are the
> most recent examples of recurring issues affecting our Flight
> Line Quality Inspectors.
>
> > 1. Quality Leadership is undermining Inspectors on
> > documented non-conformances, specifically,
> > Troubleshooting (T/S) Maintenance Actions (M/A). A
> > fluid leak on BF-148, DOMMS maintenance action
> > DOMM22338S000000002 was initiated for corrective
> > action. Quality canceled/skipped the T/S disposition
> > which outlined all requirements. They also removed the
> > picture attachment in the M/A of the fluid leak and
> > replaced the attachment with a blurred, less revealing one.
> > Furthermore, they did not follow our T/S or Break of
> > Inspection process and completed the M/A without
> > investigating the leak source or allowable limits. The leak

was located under a panel that requires DCMA buy-back. I was notified by a fellow Inspector who witnessed Quality Manager, John Reid, provide direction in the execution of the non-conformance on the aircraft. Please refer to the attached attachment for the M/A details.

2. Avoid Verbal Orders (AVO) -Union Leadership informed me, "Labor Relations has decided that AVO's will no longer be issued to Quality." I asked Quality Associate Manager, Michael D. Mahaffey, what's the policy on AVOs? His response was, "Per John Reid and Labor Relations, AVOs will no longer be provided." This new company policy will create problems for Inspectors as we are responsible for validating Production's procedure and policy compliance. As Inspectors, our signatures indicate process and procedure compliance, and that work has been performed per planning. AVOs are documentation proving Lockheed Martin Leadership has authorized a policy or procedure variance. Without AVOs, inspectors are placed in an uncomfortable and quite possibly an unethical situation because there is no written proof of a directive that authorizes a variance to policies and procedure has been given. This leads to the case where Leadership will have the final authority and direct how and when an Inspector's signature is used. Removing AVOs will only serve to degrade trust and confidence in Leadership, because Quality Inspectors will be held liable if we do or do not follow leadership's direction to vary policies and procedures.

…

Inspectors should not have to argue a rejection or work stoppage because of **work signed for, but not performed by Production,** poor execution of planning, dismissing planning, or disregarding engineering data. These requirements are contractually mandated and paid for by our customer.

…

27

> Most recently, I was denied an AVO on an aircraft inspection, whereas soon after, another Inspector received an AVO for the same task on the same aircraft that I had been denied the AVO. Furthermore, the same concerns were shared by production personnel who initiated an ESH Close Call for Leadership disregarding JTD safety warnings and requirements.

ROA. 1011-1012, bolding in original, underlining added.

The consequences of failing to follow quality assurance protocols for the manufacture of state-of-the-art F-35 jet aircraft for use by the U.S. military are not limited to the possible lesser value of services, as is immediately evident if an F-35 stops functioning properly at altitude or in combat. Moreover, Beltran reported that:

- "Quality Leadership is undermining Inspectors on documented non-conformances, specifically, Troubleshooting (T/S) Maintenance Actions (M/A). A fluid leak on BF-148, DOMMS maintenance action DOMM22338S000000002 was initiated for corrective action. Quality canceled/skipped the T/S disposition which outlined all requirements. They also removed the picture attachment in the M/A of the fluid leak and replaced the attachment with a blurred, less revealing one."

- "Without AVOs, inspectors are placed in an uncomfortable and quite possibly an unethical situation because there is no written proof of a directive that authorizes a variance to policies and procedure has been given. This leads to the case where Leadership will have the final authority and direct how and when an Inspector's signature is used. Removing AVOs will only serve to degrade trust and confidence in Leadership, because Quality Inspectors will be held liable if we do or do not follow leadership's direction to vary policies and procedures."

- "Inspectors should not have to argue a rejection or work stoppage because of work signed for, but not performed by Production, poor execution of planning, dismissing planning, or disregarding engineering data. These requirements are contractually mandated and paid for by our customer."

*Id*.

28

It was error on the part of the district court to determine that "there is no evidence this cost to the customers is significant especially in light of the overall contract," as this conclusion disregarded the fundamental fact that Beltran was reporting, in unambiguous terms, that Lockheed management was undermining contractually mandated quality and safety assurance processes controlling the manufacture of multimillion dollar military fighter aircraft. Hence, the district court erred when it held that there was not a factual question as to whether the forgoing might have constituted a report of gross mismanagement of a Federal contract, a gross waste of Federal funds, an abuse of authority relating to a Federal contract, and/or a substantial and specific danger to public health or safety such that Beltran engaged in protected activity under the NDAA.

## II.  The district court erred when it made a factual determination that Beltran failed to demonstrate a material fact exists regarding whether the email he sent to Lockheed top management on January 6, 2023, was the but-for causation of his termination.

### A. Standard of Review.

This Court reviews *de novo* a district court's ruling on a motion for summary judgment, applying the same legal standard as the district court in the first instance. *Wyatt,* 297 F.3d 405, 408 (5th Cir.2002). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Wyatt,* 297 F.3d at 408–09. When assessing whether a dispute to any material fact

exists, this Court considers all of the evidence in the record but refrains from making credibility determinations or weighing the evidence. *Reeves,* 530 U.S. 133, 150, 120 (2000).

### B. Temporal Proximity.

The causation standard for whether an adverse employment action was taken in retaliation for protected activity under the NDAA is the contributing factor standard. *Wondercheck*, 495 F. Supp. 3d at 484. A contributing factor "is broad and forgiving" and need not meet the requirements of but-for causation and instead, a plaintiff need only show that any consideration of the protected activity contributed to the adverse employment action decision. *Id*.

The Fifth Circuit has explained that close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation:

> To demonstrate the third element of a prima facie case of retaliation—a causal connection between the protected activity and the adverse action—a plaintiff must demonstrate that the employer's decision "was based in part on knowledge of the employee's protected activity." "Close timing between an employee's protected activity and an adverse action against him *may* provide the 'causal connection' required to make out a prima facie case of retaliation."

> The Supreme Court has observed that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to

> establish a prima facie case [of retaliation] uniformly hold that the temporal proximity must be 'very close.'" We have ruled, for example, that a six-and-a-half-week timeframe is sufficiently close, but that a five month lapse is not close enough, without other evidence of retaliation, to establish the "causal connection" element of a prima facie case of retaliation.

*Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (internal citations omitted). *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (noting that a three-month or four-month period may be close enough to make a *prima facie* showing of causation but holding that a twenty-month period was not); *Washburn v. Harvey*, 504 F.3d 505, 511 (5th Cir. 2007).

The district court's analysis of NDAA causation is limited to the following, "Additionally, and in the alternative, the Court finds Beltran has failed to demonstrate a material fact exists regarding whether the letter was the but-for causation of his termination." ROA. 1106. However, it analyzed causation in Beltran's Title VII retaliation claim and noted that:

> Beltran improperly bases his 77-day time period on his termination occurring on March 30, 2023. *Id.* at 40. March 30 was the day Lockheed met with Beltran to give him a chance to tell his side of the story—which he refused to do. ECF No. 63-2 at 126. But the DRC did not meet on Beltran's case until May 16, 2023, and his termination letter was sent on May 22, 2023. *Id.* at 126, 167. Thus, at a minimum, the time period was 124 days, which is outside of the four-month period cited by Beltran.

ROA. 1106.

Lockheed Martin placed Beltran on an indefinite suspension after removing him from the facility on March 22, 2023, and Jefferson, Lockheed's Senior Manager of Labor and Employee Relations for Lockheed Martin's Fort Worth Facility, and his team investigated and evaluated the facts to determine the appropriate level of discipline. ROA. 686-688, 698, 710, 766.

The district court's determination that the DRC did not meet on Beltran's case until May 16, 2023, and his termination letter was sent on May 22, 2023, fails to consider that Jefferson made the decision and implemented the process to terminate Beltran's employment in March of 2023 when he referred Beltran's case to the DRC because he believed there was evidence to support a just cause standard for Beltran's termination. ROA. 987:8-14, 1004:15-1006:3, 1007:12-14. Jefferson's decision to proceed with efforts to terminate Beltran's employment on March 30, 2023, was 77-days after Jelich forwarded Beltran's January 6, 2023 email to him on January 12, 2023. Using the district court's logic, any employer could defeat temporal proximity by indefinitely suspending an employee and then initiating a termination process that takes a few months. In such case temporal proximity as a legal concept is rendered nugatory by starting, but not finishing, a termination process within the three-month or four-month period recognized under Fifth Circuit precedent.

Jefferson was the chairperson of Lockheed's Discipline Review Committee (DRC), ROA. 987:13-14, and the sole decision-maker regarding Beltran's

termination: "I am the ultimate decision-maker, yes." ROA. 1007:12-14. In fact, Jefferson was nearly unilaterally responsible for (1) the decision to take the case to the DRC, ROA. 987:8-12. ("Q: Who makes the determination that a DRC should be convened? A: The DRC is convened based on cases that are submitted and reviewed by myself as the DRC chair."); (2) building the file against Beltran, ROA. 1004:15-1006:3; and (3) making the final decision regarding Beltran's discipline. ROA. 1007:12-14. He made the decision and implemented the process to terminate Beltran's employment in March of 2023 when he referred Beltran's case to the DRC because he believed there was evidence to support a just cause standard for Beltran's termination, and the district court failed to construe the factual timeline of Beltran's termination in favor of Beltran as the nonmovant when it held that:

> Beltran improperly bases his 77-day time period on his termination occurring on March 30, 2023. *Id.* at 40. March 30 was the day Lockheed met with Beltran to give him a chance to tell his side of the story—which he refused to do. ECF No. 63-2 at 126. But the DRC did not meet on Beltran's case until May 16, 2023, and his termination letter was sent on May 22, 2023. *Id.* at 126, 167. Thus, at a minimum, the time period was 124 days, which is outside of the four-month period cited by Beltran.

ROA. 1101.

### C. Lockheed Martin's more lenient treatment of Beltran before he exercised his NDAA rights, compared to its harsh treatment of him afterwards, created a jury issue of causation.

The causation standard for whether an adverse employment action was taken in retaliation for protected activity under the NDAA is the contributing factor

standard. *Wondercheck*, 495 F. Supp. 3d at 484. A contributing factor "is broad and forgiving" and need not meet the requirements of but-for causation and instead, a plaintiff only needs to show that any consideration of the protected activity contributed to the adverse employment action decision. *Id*.

In *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702 (5th Cir. 2016), *affirmed in part and reversed in part*), the Fifth Circuit held that the defendant's more lenient treatment of plaintiff for the same sort of offense before she exercised her FMLA and Title VII rights, compared to its harsh treatment of her afterwards, created a jury issue of causation. Similarly, its inconsistent treatment of other employees, sometimes harsh and sometimes not, created a dispute of material fact. *Id.* Specifically, the *Wheat* Court noted:

> After providing its revised explanation, the Commission did not make any reference, corrective or otherwise, to its original non-retaliatory explanation for discharging Wheat ("[n]o JDS officer [ ] ever physically attacked a youth ... [or was] allowed to remain in the Commission's employ after any such attack").[3] In other words, the grounds for Wheat's discharge related solely to the incidents of January 3, 2012, immediately preceding her discharge. In this light, the Commission offers no evidence or argument to distinguish this different treatment of Wheat before and after exercising her protected rights.[4] Therefore, the Commission's inconsistent treatment of Wheat raises disputed issues of material fact as to whether: but for exercising her rights she would have been discharged.
>
> > n. 3 On appeal, for the first time, the Commission "agree[d] that to the extent Ms. Wheat's prior use of excessive force shows that her conduct was not

34

> unprecedented, the Commission stood corrected."
> *Appellee Brief*, at 34.
>
> n. 4 Although the Commission has consistently described the 2005 incident in its briefing before the district court, and this Court, it has never attempted to address or explain why it treated Wheat differently in 2005, than it did in 2012.

*Wheat*, 811 F.3d at 710-11.

Beltran requested the AVO from Mahaffey in December of 2022, and he was disciplined but not terminated. ROA. 826. When Irv Hodges requested an AVO for the same task, he was not disciplined. ROA. 526, 666-667. Worse still, Hodges received the AVO he requested whereas Beltran did not. ROA. 666-667. Lockheed then returned Beltran to work after a five-day suspension—it did not terminate him. ROA. 599-602. Still worse, Lockheed did not terminate Ed Bruegger for his alleged insubordination and instead suspended him without pay for approximately one month. ROA. 603. Lockheed is unable—and in fact does not attempt—to explain why it tolerated alleged insubordination from Beltran in December of 2022 without terminating him, conduct which was identical to Beltran's by Hodges without terminating him, and insubordination from Bruegger without terminating him. Despite having asserted that alleged insubordination is a terminable offense, Lockheed tolerated such conduct from both Beltran and other employees without terminating them.

## CONCLUSION

The district court erred when it decided on summary judgment whether Beltran's raising safety/management concerns in an email he sent to Lockheed Martin's top management on January 6, 2023, was not protected activity under the NDAA purportedly because, "nothing in Beltran's January 6, 2023 email establishes that Beltran reasonably believed he was making a disclosure regarding the gross mismanagement of a federal contract" such that his email amounted to no more than "run-of-the-mill policy disputes between managers and employees," even though this issue is a question of fact for the jury. It further erred when it granted Lockheed Martin's motion for summary judgment on Beltran's NDAA retaliation claim after determining that Beltran failed to demonstrate a material fact exists regarding whether the email he sent to Lockheed top management on January 6, 2023, was the but-for causation of his termination. As these are questions of fact for the jury, Beltran has demonstrated that the district court erred when it entered summary judgment on his claims.

## REQUEST FOR ORAL ARGUMENT

Beltran respectfully requests that this Court hear oral argument.

Respectfully submitted,

/s/ Nicholas Woodfield
Nicholas Woodfield, Esq.
The Employment Law Group, P.C.
1717 K St., N.W., Ste. 1110
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
*Counsel for Appellant*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the above and foregoing

pleading has been forwarded to via electronic filing on September 4, 2025:

Micah R. Prude
State Bar No. 24051216
HOLLAND & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Fax: (214) 969-1751
Email: micah.prude@hklaw.com

/s/ Nicholas Woodfield
Nicholas Woodfield

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 9,342 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: September 4, 2025

/s/ Nicholas Woodfield
Nicholas Woodfield, Esq.
The Employment Law Group, P.C.
1717 K St., N.W., Ste. 1110
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
*Counsel for Appellant*